Page 1

1                  UNITED STATES DISTRICT COURT
                        DISTRICT OF VERMONT
2

3    ROBERT A. FORTUNATI, ADMINISTRATOR      *
     OF THE ESTATE OF JOSEPH FORTUNATI;      *
4    ROBERT A. FORTUNATI and SUSAN           *
     FORTUNATI; and MARK FORTUNATI           *
5                                            *    Civil No.
                   vs.                       *    1:07-cv-143
6                                            *
     ANDREW CAMPAGNE, MARC THOMAS, JEREMY    *
7    HILL, TODD PROTZMAN, ROB SNETSINGER,    *
     KARL GARDNER, HUGH O'DONNELL,           *
8    MIKE DUDLEY & WALTER GOODELL            *

9                    D E P O S I T I O N

10                           of

11                     WALTER GOODELL

12        Taken on behalf of the Plaintiffs on
          Wednesday, February 18, 2009, at the
13           Office of the Attorney General,
                   Montpelier, Vermont.

14   APPEARANCES:

15
     GEORGE E. SPANEAS, ESQ., of the firm Clauson, Atwood &
16   Spaneas, 10 Buck Road, Hanover, New Hampshire, 03755,
     appeared and represented the Plaintiffs.
17
     DAVID R. GROFF, ESQ., of the Office of the Attorney
18   General, 109 State Street, Montpelier, Vermont,
     05609-1001, appeared and represented the Defendants.
19

20
        ALSO PRESENT:  Susan Fortunati
21

22   COURT REPORTER:  Lisa M. Hallstrom, RPR, CRR, CCP

23
                   GREEN MOUNTAIN REPORTERS
24                     P.O. Box 1311
                   Montpelier, VT 05601
25                     (802)229-9873

Page 4

1          (Commencing at approximately 1:07 p.m.)

2   WALTER GOODELL:   Being first duly sworn by a
                      Notary Public to tell the truth,
3                     deposes and says as follows:

4              E X A M I N A T I O N

5   BY MR. SPANEAS:

6   Q    Sir, could you just please state your name and

7   spell it so we have it for the record?

8   A    Walter Goodell.  W-A-L-T-E-R, G-O-O-D-E-L-L.

9   Q    Okay.  And, Mr. Goodell, as of June 24, 2006,

10  what was your position with the Vermont State Police?

11  A    I was the B Troop commander, rank of captain.

12  Q    Okay.  And do you still hold that same position

13  today?

14  A    No, sir, I do not.

15  Q    What's your position -- how's your position

16  changed since June 24, '06?

17  A    I have transferred into the assistant field force

18  commander's job, which is still a captain's rank, but

19  the duties are different.

20  Q    Okay.  What were your duties as of June 24, '06?

21  A    As a troop commander I oversaw the operations

22  that occurred within B Troop's area, which encompassed

23  the Derby, St. Johnsbury, and Bradford barracks.

24  Q    Okay.  And now with your position what's your --

25  what's your job duties or responsibilities?

Walter Goodell
2/18/2009

Page 5

1    A    Essentially I stand in for the major of the Field

2    Force Division, which means all of the uniform

3    troopers in Vermont, in the event that he's not

4    available or is out of state.  I oversee the training

5    and deployment of all the Vermont State Police special

6    team assets.  I oversee the operations in the four

7    communication centers around the state and a whole

8    host of other variety of tasks that I'd be happy to

9    talk about them if you want them but --

10   Q    No, that's fine.  So you were -- you did have a

11   position as a captain June 24, 2006?

12   A    Yes.

13   Q    Okay.  What -- what are the ranks that are

14   superior to captain in the Vermont State Police?  I

15   just want to know how high up in the rank you were.

16   A    Sure.  Major and colonel.

17   Q    Those are the next two?

18   A    Those are the remaining two, yes.

19   Q    Okay.  What did you do to prepare for today's

20   deposition?

21   A    I reviewed my reports that were prepared, the ICS

22   forms, incident command forms.  I reviewed the log of

23   events that I asked Sergeant Bruce Melendy to prepare

24   during the course of the incident.  I looked at

25   newspaper articles that had been written at the time

Walter Goodell
2/18/2009

Page 59

1   A    He -- he mentioned TSU after starting some

2   dialogue about the conver -- about the situation.  And

3   we had a telephone conversation where I asked him a

4   series of questions in regards to specifics to make a

5   determination as to whether or not I was going to

6   specifically ask for TSU because he's making me aware

7   of the situation but within our -- our structure he

8   can't -- he can't make that happen.  It's got to go

9   through a commanding officer.  So he -- he mentioned

10  this might be a case that we might want to consider

11  TSU, and then we had additional dialogue where I asked

12  him a series of questions regarding the specifics of

13  the case in order to make a determination myself as to

14  whether or not I was going to contact the assistant

15  field force commander to seek permission for the use

16  of that resource in this case.

17  Q    Okay.  So you have -- you have the authority

18  to --

19  A    Request.

20  Q    -- request activating the TSU, and then if the

21  request is granted, you're in charge of the operation?

22  A    Yes.

23  Q    Okay.  When Mr. Protzman called you -- so your

24  first conversation with Mr. Protzman about the matter

25  was over the phone on June 24, 2006, the matter being

Walter Goodell
2/18/2009

Page 60

1    Joseph Fortunati?

2    A    Yes.

3    Q    All right.  And what information did he convey to

4    you over the phone?

5    A    He gave me -- initially he gave me an overview of

6    the situation as it -- as it kind of evolved.  He

7    talked about the previous encounters -- he told me

8    about the situation that had occurred that day first

9    in regards to Robert Fortunati and the interaction

10   between Robert Fortunati and the Vermont State Police

11   in regards to Robert's request for assistance because

12   of the situation that had involved Joseph earlier

13   where Joseph had pointed a firearm at their son when

14   they went out to visit him at this campsite.  So he

15   spoke about that.  He spoke -- when I inquired further

16   as to location -- we covered a variety of topics, but

17   we covered the location, where he was -- the proximity

18   of the location where the campsite was located.  We

19   talked about the interaction that Mr. Fortunati --

20   Joseph Fortunati had prior to this day that seemed

21   to -- to start at one level where he had interaction

22   with somebody from the EPA and then it had seemed to

23   escalate up to the stage that it was at on this

24   particular day where there was obviously a

25   domestic-type situation involving other family members

Page 61

1    that went there on his behalf to try to -- to try to

2    move him from that location to property that was owned

3    by the family, and then the subsequent scenario that

4    had unfolded where Mr. Fortunati ended up pushing his

5    son out of the way when Joseph pointed a handgun at

6    his head and made some comments to the effect that he

7    had him right between the eyes.

8         We started to discuss obviously the amount of

9    aggression that had been displayed by Joseph Fortunati

10   towards his family members, and then I did some

11   additional questioning with regards to the location

12   where this incident was occurring and whether or not

13   there was a potential for anybody else to happen to be

14   able to stumble into Mr. Fortunati where he was camped

15   knowing that he had already exhibited this behavior

16   earlier in the day to make a determination as to how

17   quickly we need to respond to this situation.  So we

18   covered a large number of questions that I had

19   relative to the specific situation that this occurred

20   earlier in the day so that I could make an objective

21   decision about the next course of action and whether

22   or not I felt that the situation rose to the level of

23   requiring a Tactical Services Unit response for an

24   on-scene commander to manage it effectively to try to

25   ensure safety of the public, our troopers, and

Page 62

1    Mr. Fortunati.

2    Q    Okay.  After the phone conversation on June 24

3    with Mr. Protzman, the initial phone conversation

4    where you were informed of Joseph -- the Joseph

5    Fortunati matter, did you make a decision with

6    Mr. Protzman over the phone that you were going to

7    request TSU or did you hang up the phone, process

8    information, do something else, and then at some other

9    time request TSU?  Did you tell Mr. Protzman -- sorry

10   if I'm going fast -- or did you tell Mr. Protzman we

11   will activate or request TSU?

12   A    I'm not sure exactly how that dialogue went, but

13   the next step in the chronology of events was that I

14   contacted Captain John Filipek, who's now the major,

15   and explained the situation to him and told him that

16   based upon what I knew about the situation and the

17   facts that I had been able to collect from Sergeant

18   Protzman, I felt very strongly that this was a case

19   where we did want to use the Tactical Services Unit to

20   respond to try to mitigate the situation.

21   Q    So your next step was to contact Mr. Filipek?

22   A    Yes.

23   Q    And you conveyed information to Mr. Filipek

24   regarding this situation?

25   A    Yes.

Walter Goodell
2/18/2009

Page 63

1    Q    And did he say -- he gave you approval?

2    A    Yes.  After we reviewed all of the facts that I

3    explained to you earlier that Sergeant Protzman and I

4    had discussed, he granted the authorization of the use

5    of the Tactical Services Unit.

6    Q    At the time that you requested the TSU team to be

7    activated, the only information or facts that you

8    heard were those that were conveyed by Mr. Protzman to

9    you, is that true?

10   A    Yes, but he had additional facts from I believe

11   Trooper Amado who had conducted some investigation

12   regarding the events that had occurred in the days

13   leading up to this event which seemed to kind of

14   escalate from one point now up to the point that we

15   were at.  I also was provided with information that

16   Mr. Fortunati had some type of a mental health

17   background and that there were some concerns in

18   regards to his mental health background as -- as to

19   his capacity to actually follow through on the threats

20   that he had made to his family members.

21   Q    But that information was all -- whatever

22   information that was conveyed to you over the phone

23   was all from Mr. Protzman?

24   A    Yes.  Sergeant Protzman was the point of contact

25   that I had at the Bradford barracks that was providing

Page 65

1    managed without the Tactical Services Unit.  That's

2    the purpose of the level of scrutiny that we employ

3    within our organization is to make sure that these

4    types of decisions are not -- that they're vetted

5    at -- at multiple levels of the organization up to and

6    including the assistant field force commander so that

7    there is that level of scrutiny that occurs before

8    that trigger is flipped so that that resource can be

9    deployed.

10   Q    How long did the phone conversation between you

11   and Mr. Protzman on June 24th, '06, regarding Joseph

12   Fortunati and the consideration of activating the TSU

13   take place?

14   A    How long was it?

15   Q    Yeah.

16   A    I would say it was minutes.

17   Q    Like minutes could be 58 minutes, 30 minutes, 20

18   minutes.

19   A    Right.  Again, it was not a very brief

20   conversation.  It -- there was some length to it as

21   far as we were able to cover a lot of ground, but an

22   estimate, probably ten minutes.  In that ballpark.

23   Maybe a little bit more, but in that ballpark.

24   Q    And why did you agree -- you sort of told me

25   earlier, but let me just ask.  Why did you deem it

1   appropriate to request TSU activation based on what

2   Mr. Protzman was telling you?

3   A     Well, ultimately our responsibility is to

4   maintain the public safety.  Beyond that we have a

5   responsibility to ensure the safety of our own people

6   and in this case even Mr. Fortunati.  The way that our

7   resources are deployed, our personnel resources,

8   troopers that are on the road have access to certain

9   tools available to them on their belt that they can

10  use in high stress situations to try to mitigate those

11  situations.  In this case looking at the volatility of

12  the situation, the clear potential for violence, the

13  violence that had already occurred, the events that

14  seemed to be escalating each time that we encountered

15  Mr. Fortunati or that -- that we had any type of a

16  behavioral pattern that was developing had risen now

17  to a level where he had access to a firearm and was

18  threatening to use it on his own family members, the

19  background that I had from Sergeant Protzman about him

20  having a mental health history and I think at that

21  time knowing that there was some question as to

22  whether or not he was pursuing his therapy as he

23  should be, all of those factors weighed into my

24  decision to consider the TSU.

25         And going back to the beginning of my -- of -- of

1    the answer to your question, looking at the safety of

2    all of the members who were going to be involved in

3    this situation where we tried to arrest him now for

4    the crime that he committed that morning against his

5    family members, I knew that our troopers that are on

6    the road are trained to a certain level; however, if

7    you go into a wooded area and you have access to

8    firearms, our troopers on the road are not trained to

9    go in and find somebody, establish contact with them,

10   and then try to de-escalate the situation.  And to try

11   to create the highest likelihood of success in

12   resolving the situation peacefully utilizing the

13   Tactical Services Unit, they are trained at that

14   level, and in addition to that level of training, they

15   also have access to other tools that do not rise to

16   the level of deadly force that they might have an

17   opportunity to employ versus our troopers on the road

18   that would be forced to shoot somebody as soon as they

19   came in contact with them if the -- if the situation

20   warranted it.

21   Q    Did Mr. Protzman tell you over the phone that he

22   had known Joseph Fortunati and Joseph Fortunati was a

23   troublemaker?

24   A    No.

25   Q    Did Mr. Protzman inform you or convey information

Walter Goodell
2/18/2009

Page 83

1    Q    Do you have a copy anywhere of -- of the
2    informational packet?
3    A    I think some of the information that was
4    contained in the informational packet is contained on
5    these two maps.  I think they were included in that.
6    If they weren't, then I'm mistaken, but other than
7    that, I don't have those informational packets.  Those
8    were for people who were participating that day --
9    Q    Okay.
10   A    -- in various functions in the field.
11   Q    You didn't -- you didn't keep like an actual
12   packet that got stored somewhere in a file for -- for
13   purposes of the case?
14   A    I didn't, sir.  Anything that I have is in that
15   file that you had an opportunity to review earlier.
16   Q    Okay.  Who spoke at the briefing?  And if you
17   need to refer to your notes or something, you -- you
18   may, just let me know what you're referring to, but
19   who spoke at the briefing that you recall?
20   A    Where's my other packet?  I believe that Sergeant
21   Protzman spoke, I believe that Lieutenant Evans spoke,
22   I believe that Pam Barney spoke, and beyond that, just
23   myself in opening up the briefing.
24   Q    Okay.  As far as your speaking at the briefing at
25   the Bradford barracks on June 24, what did you offer

1    in terms of your statement?  What was opening up the

2    briefing?  What -- what substance did you convey to

3    those who were present?

4    A    Essentially it was to acknowledge the people that

5    were in the room, that we were going to be performing

6    a mission to go out and attempt to make contact with

7    Mr. Fortunati for the purposes of taking him into

8    custody, and as part of that we had prepared for

9    several hours in the afternoon to try to prepare for

10   contingencies, and as a result of those preparations,

11   we were going to lead into this briefing, and then I

12   turned it over to the individuals that I mentioned to

13   you already for the specific parts that they played in

14   it.

15   Q    Okay.  And what did Mr. Protzman -- what was his

16   role at this briefing?

17   A    He was to outline the specific criminal case that

18   had been generated that morning -- that morning by

19   Robert Fortunati in regards to the assault that

20   occurred against Mr. Fortunati's family members by his

21   son and explained also the events that led up to this

22   event starting off with the initial contact with the

23   folks from the EPA and how the -- describing the --

24   the pattern from the interaction between Fortunati and

25   the EPA up until today so that everybody in the room

Page 85

1    had the same information.

2    Q    Okay.  And when Mr. Evans spoke, what was his

3    part?

4    A    Essentially he was outlining for the remaining

5    people in the room that he would be the -- the

6    operations manager, if you will, for the TSU members

7    when they were deployed and that he would be following

8    up with a specific briefing of his own people separate

9    and apart from that so that it didn't convolute the

10   overall briefing.

11   Q    So did Mr. Evans have on June 24, '06, prior to

12   deployment a separate briefing between him and the TSU

13   members?

14   A    I believe he -- he did, yeah.

15   Q    And those -- the only people present at the

16   separate briefing as far as you know would be

17   Mr. Evans and the seven other TSU people?

18   A    Yes.

19   Q    Okay.  What did Ms. Barney -- Trooper Barney have

20   to say at the briefing?

21   A    I believe that she had been tasked earlier in the

22   day to try to collect some mental health background on

23   Joseph through local channels.  I think she worked

24   maybe with Trooper Scott Amado in that process so that

25   we would have as much information as possible prior to

Walter Goodell
2/18/2009

1    A    As far as I know they were, yes.

2    Q    Okay.  Were all seven of the members or -- or at

3    least some of them, I'm going to be questioning each

4    of them so I'm not trying to trick you on the number,

5    were they all wearing camouflage paint on their face

6    or some of them?

7    A    I think some of them were.  I'm not sure if they

8    all were.

9    Q    All right.  Was that anybody's decision, you guys

10   are going to dress in camouflage and paint your faces

11   or is that their individual own decisions or is that

12   Mr. Evans' decision?

13   A    No.  They have issued uniforms that are

14   camouflage uniforms and they're operating in a wooded

15   environment.  They're -- the object obviously is to

16   move through that wooded environment to get to an

17   objective, to make contact with that objective and

18   determine how that objective is going to react and

19   contain that objective so that we could introduce some

20   of those other resources that we have on site with

21   that HNU team if it isn't a completely passive

22   response.

23   Q    There were two HNU members present, correct?

24   A    Yes.

25   Q    All right.  Was it -- what was discussed about

Walter Goodell
2/18/2009

1    how to utilize the HNU members in this situation?  Was

2    it Mr. Evans who suggested the HNU members stay in the

3    van while the TSU members first approached Joseph or

4    was that somebody else's idea?

5    A    It's -- it's the most basic level of law

6    enforcement responsibility.  You can't put these

7    people who are trained in communications inside an

8    inner perimeter because they're not prepared for that

9    mission.  They're not trained for that mission.  We

10   get them right up as close as we can comfortably feel

11   that we can get them and keep them safe until we make

12   contact with the individual, contain the individual,

13   and then negotiate, bring the negotiators in and use a

14   variety of different means to do that.

15   Q    How would that have worked in this case best-case

16   scenario?

17   A    Best-case scenario, the TSU members go through

18   the woods.  We hope that Mr. Fortunati is still in

19   fact at the campsite that he was at earlier in the

20   day.  They are able to create a perimeter so that he

21   can't get past them and get away and be a problem at

22   the neighboring residence or go down the road, etc.

23   After we are able to make contact with him and we're

24   able to establish a clear perimeter so that we can

25   contain him and control him, then we can introduce the

1    Hostage Negotiation Unit members by various means,

2    whether it be that he's passive and he's standing

3    there and he's not armed and we can approach on foot.

4    We can use a bullhorn.  Throw phones.  There's --

5    there's a variety of different means that they have

6    available, but you can't get to C until you get to A

7    and B, and A is to locate the individual, B is to

8    contain them to make sure that you're in control of

9    the situation because as long as the individual is

10   mobile, they're more of a threat to anybody else than

11   if we're able to contain them.

12   Q    So was the idea to have the seven TSU members

13   form a circle sort of around --

14   A    Not necessarily a formal circle but a containment

15   configuration where they felt they could control him

16   if he tried to leave that area, whether they had to

17   physically take him down or whatever they had to do.

18   They've got the bean bag rounds, they've got --

19   they've got the tasers.  They've got some -- they've

20   got access to some additional equipment that our road

21   troopers don't have, and if he approaches them and

22   doesn't follow orders, get down, follow instruction,

23   then they have mechanisms -- mechanisms that they can

24   use.  Unless he's presenting himself as a deadly

25   threat, they've got some options that our road

1    troopers don't have.  So pretty -- you know, again,

2    it's a bad situation.  It's probably the worst of bad

3    situations when somebody is mobile in a wooded area

4    because the potential for this thing to move any -- in

5    any direction exists versus somebody inside a house

6    where you can put people in -- you know, on corners

7    and have an eyeball of the entire house.  Unless

8    somebody lands with a helicopter, they're not going

9    anywhere.  In the woods, however, you've got to, first

10   of all, find the person, which creates its own set of

11   problems and then, second, develop a strategy to get

12   around them so that you can contain them and then work

13   into the negotiation phase, if that becomes necessary,

14   but you can't negotiate if you don't have the

15   resources on scene.

16   Q    The HNU members are not also TSU members?

17   A    No.

18   Q    They have a completely different set of training

19   skills that they've been trained with?

20   A    They are highly trained in de-escalation

21   techniques and they work very closely with TSU.  In

22   fact, they train together regularly because these

23   situations occur frequently around Vermont.

24   Q    I see.  If the TSU -- just going on your last

25   explanation.  If the TSU had Joseph contained where he

1    couldn't run and they could control him and take him

2    to the ground or anything, then there's at that point

3    no point of having the Hostage Negotiation Unit there,

4    right, because he's already in custody?

5    A    Well, it depends on how the situation unfolds.

6    Q    I mean, if Joseph was in the middle of a circle

7    and said, okay, guys, please, can I talk to somebody

8    nice, and then you bring up the hostage negotiator,

9    maybe they have a conversation, but how would it be

10   possible under the situation for the hostage

11   negotiators to even be used in the way that this

12   approach was taken?

13   A    You couldn't introduce those hostage negotiators

14   to this individual until you contained him and you had

15   some observations of him because you would be marching

16   people right into a situation that are totally

17   unprepared to deal with it.  As soon as we contact the

18   individual and as soon as we contain the individual

19   and we can control the individual, those factors need

20   to be in place so that we can then initiate that

21   negotiation process if, in fact, it becomes necessary.

22   If this situation had gone a number of different ways,

23   hands gone up -- state police, state police, the hands

24   go up, there might not be a need for hostage

25   negotiators because the person's totally compliant.

Walter Goodell
2/18/2009

Page 102

```
 1    This is not going to be a negotiation because the

 2    circumstances have changed, but you can't utilize

 3    those resources if they're not pre-deployed to the

 4    scene.

 5    Q    Did any one of the leaders, and when I say

 6    leaders I mean you, Mr. Evans, Mr. Protzman,

 7    Mr. Melendy, let's include Ms. Barney and Mr. Twohig

 8    and Bachand, did anybody suggest using the HNU members

 9    first?

10    A    No.

11    Q    Did anybody suggest any other alternatives to the

12    approach of using the TSU members?

13    A    We talked about that earlier in the day.  That

14    leads into the discussion about do we use TSU to make

15    that contact or do we use regular road troopers, and

16    that's a very easy decision to make given the factors

17    in this case.

18    Q    Was there ever any suggestion about enlisting

19    assistance from other Fortunati family members?

20    A    No.

21    Q    Was there ever any suggestion about inquiring

22    whether Joseph Fortunati had any friends in the area

23    or somebody he had a good dialogue with or could

24    communicate with?

25    A    Yeah.  It doesn't -- discussions like that occur
```

Page 119

1    Q    It's true what I'm saying?

2    A    Yes.

3    Q    There were no -- as part of your briefing and --

4    and information that you had prior to deploying the --

5    the TSU, there were no complaints from any hikers in

6    the area, is that true?

7    A    Yes.

8    Q    There were no complaints from any people that

9    were driving vehicles along Copper Mine Road, is that

10   true?

11   A    Yes.

12   Q    Okay.  There were no complaints from any

13   landowners in the area concerning Joseph Fortunati,

14   isn't that true?

15   A    Yes.

16   Q    The area where Joseph's tent and car was located

17   was not a public place, is that true?

18   A    It actually was frequented -- frequented

19   regularly.  In fact, as we were pulling up with the

20   TSU van a vehicle was coming down the road from that

21   vicinity.

22   Q    From -- from Copper Mine Road?

23   A    Well, we were on Copper Mine Road and this was a

24   side road off of Copper Mine Road.  And we're not

25   clear exactly where, but we believe the vehicle came

Walter Goodell
2/18/2009

1    didn't arrive until after the chief criminal

2    investigator arrived and his team.  I know that

3    Lieutenant Evans had contact with Sergeant Flannigan

4    at the scene so he was around all of the commanders at

5    the scene.

6    Q    Okay.  Looking back on this case, Captain

7    Goodell, do you think it was a mistake to approach the

8    situation the way it was approached with the TSU

9    members?

10    A    Absolutely not.

11    Q    Under the same circumstances you'd do it again?

12    A    Hundred times in a row.

13    Q    Was the goal of the operation to find Joseph

14    Fortunati, make contact with Joseph Fortunati, and

15    then de-escalate the situation with Joseph Fortunati?

16    A    Those were steps towards eventually arresting

17    him.

18    Q    And then four would be take him into custody?

19    A    Yes.  Ultimately that was our goal.

20    Q    Right.  I mean, those are my notes on -- on your

21    words earlier, and I just -- I want to be clear that I

22    think you said your -- your testimony was your

23    objective or your goal was to find Joseph Fortunati,

24    make contact with Joseph Fortunati, de-escalate the

25    situation?

Walter Goodell
2/18/2009

Page 130

1   A    Yes.

2   Q    Let me just show you the first page -- these

3   documents that I have in front of me, Captain Goodell,

4   as you can see we took from your file that you brought

5   here today and made copies of, right?

6   A    Yes.

7   Q    This first page doesn't have a date on it that

8   I'm looking at.  It starts out with a phone number at

9   top?

10  A    Yes.

11  Q    222-5315.  It's not dated.  When did you make

12  these -- are these your notes?

13  A    Yes.

14  Q    This is all in your handwriting?

15  A    Yes.

16  Q    When did you make these notes?

17  A    That would have been at the time that I received

18  the call from Sergeant Protzman.

19  Q    Okay.  So you would have made these notes on June

20  24, '06?

21  A    Yes.

22  Q    Okay.  I notice off and to the right there's a

23  note that says -- well, can you read that note to me

24  there?

25  A    Yeah.  Combat cross.  Acknowledgment of bravery.