UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT


ROBERT A. FORTUNATI,                  :
Administrator of the Estate of        :
Joseph Fortunati, ROBERT A.           :
FORTUNATI, SUSAN FORTUNATI,           :
and MARK FORTUNATI,                   :
                                      :
          Plaintiffs,                 :
                                      :
          v.                          :        File No. 1:07-CV-143
                                      :
ANDREW CAMPAGNE, MARC THOMAS,         :
JEREMY HILL, TODD PROTZMAN,           :
ROB SNETSINGER, KARL GARDNER,         :
HUGH O'DONNELL, MIKE DUDLEY,          :
and WALTER GOODELL,                   :
                                      :
          Defendants.                 :


RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Paper 85)

This case arises out of events on June 24, 2006, when

Vermont State Police troopers shot Joseph Fortunati to death in

Corinth, Vermont.  Plaintiffs, all members of Mr. Fortunati's

family, filed suit in federal court on behalf of the estate of

Joseph Fortunati, as well as in their personal capacities.

Defendants moved to dismiss the case shortly after it was filed;

this Court granted the motion in part and denied it in part.

Paper 19.  After one year of discovery, Defendants now move for

summary judgment.  Paper 85.

I.   <u>Factual Background</u>

     A.   <u>The Shooting of Joseph</u>

     Most of the evidence describing the lead-up to Joseph's
shooting comes from Vermont State Police sources, as does all of
the evidence describing the shooting itself.  Plaintiffs
"dispute" many facts to avoid conceding them,[1] see Paper 87-3,
but they offer little evidence contradicting the police account.
Because Plaintiffs rely on the same officer testimony, post-
incident reports, and other police records as the Defendants, the
following facts are effectively undisputed.

     On June 23, 2006, the Vermont State Police received a call
from environmental workers attempting to take water samples in
the area of Copper Mine Road, a rural dirt road in Corinth,
Vermont.  Paper 85-3 at AG737.  The environmental workers
described two encounters with a man camped on the road, blocking
their path.  Id.  On one occasion the man's behavior was
described as "agitated," and one of the workers felt "unsure if
he would get violent," and on the other occasion, the man ran off
into the woods.  Id.  The environmental workers reported that a
neighbor apparently had also encountered the man and changed her
jogging route to avoid him.  Id.  State Police troopers met the
environmental workers in the Corinth Town Hall.  Id.  While

_____

     [1] See L.R. 7.1(c)(3) (deeming admitted all facts in
statement of undisputed facts "unless controverted by the
opposing party's statement").

2

there, the troopers saw Susan Fortunati, who noted that the man on Copper Mine Road was her step-son, Joseph Fortunati.  Id.

Later on June 23, Joseph's father, Robert Fortunati, came to the State Police barracks to speak about Joseph.  Id.  Robert told troopers that Joseph was bipolar and schizophrenic, had not been taking his medication, and was in possession of a handgun. Id.  Robert also told troopers that he and his family were available to help with Joseph, as was a mental health worker from the Clara Martin Center, who had dealt with Joseph in the past. Id.

On the morning of June 24, 2006, Robert and Susan Fortunati, along with Joseph's brother, Robert Jr., went to Joseph's campsite on Copper Mine Road to convince him to move to a more isolated location.  Paper 85-5.  The family met Joseph and spoke with him, but they were unsuccessful.  Id.  Joseph removed a handgun from his belt, aimed it at his brother, threatened to kill him, and told his family to leave.  Paper 85-6; Paper 85-5. Robert Fortunati called the State Police and informed them of what happened.  Id.  Robert asked to work with the police in formulating a plan to take Joseph in and "restrain" him.  Id.

Shortly after Robert called the State Police barracks, shift commander Sergeant Todd Protzman contacted his superior officer, Captain Walter Goodell.  Paper 85-9 at AG 866-67.  Protzman briefed Goodell on the situation with Joseph Fortunati, and

requested activation of the State Police's Tactical Services Unit (TSU). Paper 85-24 at 59-61. The TSU is a specialized, SWAT-type unit within the Vermont State Police, used for dangerous or high-stress situations. Id. at 67. Goodell asked his superiors for activation of the TSU, and received permission. Id. at 62-63.

Either before or after activating the TSU, the State Police investigated Joseph's background and learned he had previously been in a car chase with police in which he displayed a firearm. See Paper 85-35 at 107-08 (demonstrating that police had this information by the time TSU members were later deployed). Investigating officers also learned that Joseph had struggled with state troopers as they attempted to bring him into custody, resulting in injury to one trooper's hand. See id. (same).

Upon authorization of the TSU, team members gathered at the Bradford barracks for a briefing. Id. at 83-85. No particular instruction was given on how to approach Joseph in light of his mental illness. Paper 85-36 at 35-36; Paper 85-30 at 158-59. The goal was to "take him into custody." Paper 85-30 at 158.

Shortly before 7:00 p.m. on June 24, 2006, the TSU was deployed near Joseph's campsite on Copper Mine Road. Paper 85-9 at AG 867. Other units stood back for support, including a canine unit, id., and a hostage negotiations unit, Paper 85-24 at 97. Seven TSU members advanced toward Joseph's campsite. Paper

85-36 at 58.  They carried assault rifles, tasers, and shotguns with beanbag ammunition, and wore camouflage uniforms with face paint.  Id. at 66; Paper 85-30 at 95.  As they approached the wooded site, the troopers split into two groups.  Paper 85-36 at 59-61.

Joseph was standing on a hill in the road and saw one trooper, Sergeant Robert Snetsinger, approaching.  Paper 85-35 at 29.  Joseph waved to Snetsinger, who identified himself as police and asked Joseph to come down the hill to talk.  Id. at 29-31.  Joseph responded that instead Snetsinger could come up to where he was standing.  Id. at 34.  After exchanging a few more words, Joseph began to walk away from Snetsinger, up the hill toward his campsite.  Id. at 35.  Moments later, Joseph saw the other group of troopers who were approaching from a different direction.  Paper 85-30 at 38.  Sergeant Marc Thomas told Joseph to show his hands and stay where he was, but Joseph turned and moved back in the direction he had come.  Id. at 42; Paper 85-36 at 91-92.

Shortly thereafter, Sergeant Jeremy Hill fired a shotgun beanbag round at Joseph.  Paper 85-30 at 49; Paper 85-26 at 30-31.  The round missed and Joseph ran into the woods.  Paper 85-26 at 34.  Troopers ran into the woods after Joseph, but he avoided them and circled around to his car, which was parked in the road.  Paper 85-36 at 102-05; Paper 85-30 at 54-63.  Joseph opened the driver's side door of the car.  Paper 85-26 at 49.  Hill fired

another beanbag round at him, which missed and smashed in the car's rear window. Id. Joseph leaned inside the car, apparently rummaging around the floorboard or center console area. Id. at 50; Paper 85-30 at 65. Then Joseph straightened up and walked away from his car toward Hill. Paper 85-26 at 53-54. Hill fired two more beanbag rounds at Joseph, hitting him twice in the stomach area. Id. at 54. Joseph turned and began moving into an open field adjacent to the road, and as he moved away, Hill fired a final beanbag round, hitting him in the back. Id. at 57-60. Throughout this time, troopers were giving Joseph orders to stop and put his hands up. See, e.g., id. at 45.

Joseph entered the field and stopped, facing Sgt. Thomas, who was already there. Paper 85-36 at 110. Thomas observed a handgun in Joseph's right hand, pointed down toward the ground. Id. Thomas notified the other troopers that Joseph had a gun, and ordered him to put the gun down. Id. at 110-11. Agitated, Joseph yelled that Thomas should just shoot him in the head, then slowly put the gun in his waistband. Id. at 111-13.

Joseph turned away from Thomas and moved to a cluster of two or three trees on the edge of the field, putting the trees between himself and the troopers. Id. at 117; Paper 85-35 at 51. The troopers converged on Joseph's location, approaching the cluster of trees from different angles. Paper 94-11 at 75-77. Troopers yelled commands at Joseph, telling him to show his hands

and step out from behind the trees; they may have ordered him to
drop his weapon.  Paper 85-36 at 122; Paper 85-35 at 77.  The
troopers also communicated more generally with Joseph, telling
him to be reasonable and that nobody needed to get hurt.  Paper
94-11 at 83; Paper 85-36 at 122.

Joseph moved from side to side, looking around the cluster
of trees, Paper 94-11 at 91; Paper 85-26 at 72; Paper 85-36 at
122-23, and he may have stepped away from the trees briefly, or
showed his hands for a few moments.  See Paper 85-30 at 94
(recalling Joseph moving out from the trees to wave at a
helicopter, then moving behind the trees again); Paper 85-14 at
AG907 ("[Joseph] raised and lowered his hands a couple of times.
His hands would only be up for a second then he would lower them
back down to his side or grasp the tree and peer around it.").
But see Paper 85-36 at 122-23 (one trooper's memory that Joseph
did not move out from behind the trees).  Joseph was agitated and
moved erratically.  Paper 85-30 at 93.  Because Joseph was behind
the cluster of trees, troopers' views of him were partially or
fully obstructed at times, depending on his movement.  See, e.g.,
Paper 85-26 at 72, 78; Paper 85-36 at 123.

Sgt. Snetsinger moved around to one side and fired a beanbag
round, hitting Joseph in the back.  Paper 85-35 at 83.  Joseph
started to turn toward Snetsinger, and reached for the gun in his
waistband.  Paper 85-30 at 96; Paper 85-36 at 124; Paper 87-8 at

86; Paper 85-20 at 64; Paper 85-14 at 3. Joseph pulled the gun out,[2] at which point troopers Campagne and Thomas fired three shots. Paper 85-36 at 126; Paper 85-30 at 101-02. Two bullets hit Joseph, killing him. Paper 85-34 at 10-11.

As these events unfolded, two State Police troopers were at the Fortunati residence with Joseph's family. Paper 87-17. The troopers knew the TSU had been deployed against Joseph, but did not tell the Fortunatis. Id. Rather, the troopers had been instructed to occupy the Fortunatis and keep them in their home, while the TSU executed its mission. Id. After Joseph was killed, the troopers left without informing the Fortunatis. Paper 87-6 at 2. The family learned of Joseph's death hours later through a relative or neighbor. Paper 87-6 at 2.

B.  The Family Encounter with the Police

Upon hearing the news, Robert, Susan, and Mark Fortunati (another of Joseph's brothers) drove to the scene at Copper Mine Road in Robert's truck, where a second, subsidiary incident ensued. Id. Unlike Joseph's shooting, Plaintiffs are able to offer their own independent recollection of what occurred here, which is different from that of the police.

According to the Plaintiffs, they stopped "by a police car," which was apparently parked in or near the road but did not

---

[2] This moment in time is discussed in more detail below. See Section III.A, infra.

constitute a roadblock. Paper 87-6 at 2. After the truck
stopped and Robert got out, police pointed their guns and yelled
at the Fortunatis, pushing Robert into the side of his truck and
handcuffing him. Id. Police ordered Susan and Mark out of the
truck at gunpoint, and handcuffed them as well. Id. Plaintiffs
maintain they were not speeding as they approached the police,
they were not aggressive or violent, nor did they resist arrest
or verbally threaten the police. Id.

According to the Defendants, a police cruiser was parked
across the road, blocking it in order to maintain security at the
scene of the shooting. See, e.g., Paper 85-7 at 1. The
Fortunatis' truck approached the roadblock "at a high rate of
speed," looking like it was "going to ram the parked cruiser."
Id. "[A]t the last second," the truck swerved around the police
car and stopped abruptly. Id. According to the police, Robert
immediately got out of the truck and approached an officer,
ignoring orders to stop and put his hands on his vehicle. Id. at
1-2. When Robert had approached to within arm's reach, an
officer grabbed him and turned him around, pushing Robert into
his truck. Id. at 2. Robert resisted efforts to handcuff him.
Id. Defendants maintain that Susan and Mark were handcuffed
because they were yelling at the police. Id.

Both sides' briefs mention that the Fortunatis were taken to
the nearby barracks, where Robert was charged with negligent

driving and resisting arrest, and Susan and Mark were released.
<u>See</u> Paper 85-1 at 18; Paper 87-2 at 12.  Robert's charges were
apparently dropped.  <u>See</u> Paper 87-2 at 12.

II.  <u>Standard of Review</u>

A party moving for summary judgment must provide sufficient
factual evidence to support a legal finding in his favor, then
point out the lack of evidence supporting his opponent's legal
position.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 325
(1986).  In response, the non-moving party must demonstrate
specific facts that support his legal position.  <u>Id.</u> at 324.  The
non-moving party may not rest on allegations in the pleadings or
unsupported assertions; rather, he must provide evidence in the
form of affidavits, depositions, interrogatory answers, and the
like.  <u>Id.</u>

The court then assesses the evidence, viewing it in a light
most favorable to the non-moving party.  <u>Adjustrite Sys., Inc. v.
GAB Bus. Serv., Inc.</u>, 145 F.3d 543, 547 (2d Cir. 1998).  If
"there is no genuine issue as to any material fact," and the
facts establish that the moving party is entitled to judgment as
a matter of law, then the district court should grant the motion.
Fed. R. Civ. P. 56(c); <u>Celotex</u>, 477 U.S. at 322.  A "material
fact" is one that "might affect the outcome of the suit under the
governing law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,
248 (1984).  A "genuine issue," in turn, means the evidence

diverges enough to support a finding in favor of either party.
Id. If a genuine issue of material fact exists, the court must
deny the motion. Fed. R. Civ. P. 56(c).

III. <u>Discussion</u>

Plaintiffs bring both constitutional and state-law claims
against various combinations of Defendants based on Joseph's
shooting and the Fortunati family's arrest.

A. <u>Fourth Amendment Claims for Shooting Joseph with
Assault Rifles</u>

In Count I, Plaintiffs allege that Defendants Campagne and
Thomas violated Joseph's Fourth Amendment rights by using
excessive force when they shot him with their assault rifles.
Plaintiffs base the claim on 42 U.S.C. § 1983, which provides a
civil cause of action for damages against anyone who, acting
under color of state law, deprives another of constitutional
rights. <u>See</u> 42 U.S.C. § 1983; <u>Monroe v. Pape</u>, 365 U.S. 167
(1961).

Under the Fourth Amendment, police are limited to
"reasonable" force in effecting a seizure. <u>Graham v. Connor</u>, 490
U.S. 386 (1989). The reasonableness of a use of force depends on
"the severity of the crime at issue, whether the suspect poses an
immediate threat to the safety of the officers or others, and
whether he is actively resisting arrest or attempting to evade
arrest by flight." <u>Id.</u> at 396. Killing a suspect constitutes a
seizure, <u>Tennessee v. Garner</u>, 471 U.S. 1, 7 (1985), and the

11

Fourth Amendment reasonableness standard applies.  <u>Scott v.</u>
<u>Harris</u>, 550 U.S. 372, 382-83 (2007).  Using deadly force can be
reasonable, however, "if the suspect threatens the officer with a
weapon or there is probable cause to believe that he has
committed a crime involving the infliction or threatened
infliction of serious physical harm."  <u>Garner</u>, 471 U.S. at 11.

In general, "[t]he 'reasonableness' of a particular use of
force must be judged from the perspective of a reasonable officer
on the scene, rather than with the 20/20 vision of hindsight."
<u>Graham</u>, 490 U.S. at 396.  The reasonableness inquiry is also
limited to "circumstances immediately prior to and at the moment
[the police] made the split-second decision to employ deadly
force." <u>Salim v. Proulx</u>, 93 F.3d 86, 92 (2d Cir. 1996).  District
courts in the Second Circuit are precluded from taking a broader
view and considering, for example, whether the police created the
need for deadly force in the first place.  <u>Id.</u>

Defendants Campagne and Thomas assert qualified immunity as
a defense to Plaintiffs' Fourth Amendment claim.  Paper 85-1 at
30-33.  Under qualified immunity doctrine, government actors are
not liable for damages unless they "violate clearly established
statutory or constitutional rights of which a reasonable person
would have known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818
(1982).  The qualified immunity inquiry has two steps.  First,
the court asks whether a plaintiff has shown facts that violate a

constitutional right. Second, if a violation is shown, the court asks whether the right in question was "clearly established" at the time of violation. See Saucier v. Katz, 533 U.S. 194 (2001) (clarifying the two-step inquiry), modified by Pearson v. Callahan, 129 S. Ct. 808 (2009) (holding that courts can reverse the order if desired). The defendant receives qualified immunity unless both prongs are answered in the affirmative. Pearson, 129 S. Ct. at 815-16.

Plaintiffs' claims against Campagne and Thomas can be resolved on the first prong of qualified immunity analysis. Under this prong, the Court must examine the merits of Plaintiffs' Fourth Amendment claim, and therefore must determine whether Campagne and Thomas's actions were objectively reasonable. Graham, 490 U.S. at 396. Relevant factors include whether Joseph was attempting to escape the officers, what his suspected crime was, and whether he was threatening the police or bystanders with harm. Id.. In this case, the controlling factor is whether Joseph was threatening the police with immediate harm at the moment Campagne and Thomas shot him.[3]

---

[3] The other Graham factors are relevant, but not controlling in this situation. As for Joseph's suspected crime, the police had probable cause to believe he had committed aggravated assault earlier that day when he pointed a gun at his family. Paper 85-6. Police were also concerned about this happening again, given earlier reports of passers-by encountering Joseph on the road. See Paper 85-3 at AG737. Neither was in progress at the time of the shooting, however. In terms of attempting to escape, Joseph walked or jogged away from the police, Paper 85-26 at 29; at one

Plaintiffs assert several reasons why that this crucial fact is disputed and should be decided by a jury.[4]  To begin, Plaintiffs argue the evidence is unclear whether Joseph even drew his gun, and if so, what he was doing with it.  <u>See</u> Paper 87-2 at 15-18; Paper 99 at 6-8.  Plaintiffs correctly point out that the troopers' accounts vary in describing what happened after Sgt. Snetsinger shot Joseph with his beanbag shotgun.  One trooper reported that Joseph drew his gun and pointed it at the police.

---

point he ran to avoid them, but then returned to the general campsite area, Paper 85-30 at 54-63.  In the moment that Joseph was actually shot, he was more or less stationary behind a tree. Paper 85-11 at AG894.  That said, Joseph was disobeying police orders throughout the incident, and generally attempting to avoid the troopers.  Paper 85-36 at 91-93, 122.  All of these facts are essentially undisputed, but on their own – absent an immediate threat of serious harm to the police – they would not have made it reasonable to shoot Joseph.  <u>See</u> <u>Garner</u>, 471 U.S. at 11.

Furthermore, <u>Salim</u> makes clear that courts in the Second Circuit should focus on the circumstances immediately prior to the use of deadly force.  <u>Salim</u>, 93 F.3d at 92.  This is true even if the police made earlier mistakes that ultimately created the need for deadly force.  <u>Id.</u>  As a result, the critical question is whether Joseph was threatening the troopers with immediate and serious harm at or around the moment he was shot.

[4] As an overarching matter, Plaintiffs point out that the only surviving witnesses are police officers; because Joseph is dead, "'the witness most likely to contradict [the police officer's] story . . . is unable to testify.'"  <u>O'Bert ex rel. O'Bert v. Vargo</u>, 331 F.3d 29, 37 (2d Cir. 2003) (quoting <u>Scott v. Henrich</u>, 39 F.3d 912, 915 (9th Cir. 1994) (alteration in original)).  In this situation, courts are to consider circumstantial evidence that could undermine police officers' stories, and "'not simply accept what may be a self-serving account by the police officer.'"  <u>Id.</u>  Yet as explained above, the evidence hangs together, and even with <u>O'Bert</u>'s heightened scrutiny there is no genuine dispute about whether Joseph was threatening the police with harm in the moment he was shot.

Paper 87-19 at 27. Another trooper reported Joseph drawing his weapon in a "fast aggressive motion," and raising it up to chest-level, yet with the barrel pointed down. Paper 85-36 at 124, 126. Another trooper saw him reach toward the front of his pants, yet because Joseph's back was turned, could not see his hand. Paper 94-7 at 86-87; Paper 85-10 at AG911. Another trooper described Joseph drawing his gun in a "deliberate" motion, then holding it in a "low-ready" position. Paper 94-11 at 96-106; Paper 85-11 at AG894-AG895. Another trooper reported Joseph reaching toward his waistband, where his gun was located.[5] Paper 85-12 at AG903. Another trooper described Joseph drawing his handgun "in an aggressive motion." Paper 85-14 at AG907. The final trooper was away from the scene and did not see what happened. Paper 85-15 at AG898.

While the accounts vary slightly, this Court finds there is no genuine issue as to whether Joseph threatened the troopers with his gun. All observers report him making a rapid motion toward his gun in response to Sgt. Snetsinger's beanbag, in a context strongly suggesting his intent or readiness to use the gun. See, e.g., Paper 85-36 at 124 (describing Joseph reaching toward his gun and the trooper's thought that Joseph "was going

---

[5] This was Sgt. Hill. From Hill's post-incident report and the portions of Hill's deposition submitted by the parties, it is unclear to what extent Hill could see Joseph. See Paper 85-12; Paper 85-26; Paper 87-9; Paper 94-9.

to shoot Sergeant Snetsinger"); Paper 85-14 at AG907 (describing
Joseph drawing his gun and the trooper's fear that Joseph "was
pulling the gun out to shoot at me or other members of my team").
Small disagreements over the gun's exact positioning are not
enough to create a genuine issue of fact, given that Joseph
grabbed his gun and appeared ready to shoot.  See, e.g., Gaddis
ex rel. Gaddis v. Redford Township, 364 F.3d 763, 773 (6th Cir.
2004) ("This sort of minor conflict of perception is common and
is not sufficient to create a material dispute of fact as to the
officers' credibility."); Anderson v. Russell, 247 F.3d 125, 130-
31 (4th Cir. 2001) ("In a rapidly evolving situation such as this
one, a witness's account of the event will rarely, if ever,
coincide perfectly with [another witness's] perceptions
. . . .").

        Plaintiffs next argue that Joseph could have been pulling
out his gun in order to surrender it, rather than to shoot at the
officers.  Paper 87-2 at 23-25.  They note the troopers were
giving Joseph commands to drop his weapon, and suggest that his
motion toward the gun could have been an attempt to comply with
orders.  Id.  This argument fails on the facts.  As an initial
matter, it is unclear whether Thomas ever ordered Joseph to drop
his gun when Joseph was behind the trees,[6] but even if he did,

_____

        [6] Sgt. Thomas stated in his deposition that he was
"continuously" giving Joseph orders to drop the gun.  Paper 87-11
at 122.  However, reading Thomas's deposition answer, his

                                16

Plaintiffs' theory that Joseph drew his gun in response – to surrender it – is not plausible. All accounts agree that Joseph's action was a response to Snetsinger's beanbag shot, not a response to a verbal order. See, e.g., Paper 85-36 at 124; Paper 85-30 at 95-96. The evidence also consistently describes Joseph's motion as threatening, not as suggestive of surrender. See, e.g., Paper 85-14 at AG907; Paper 85-13 at AG923, Paper 85-36 at 124. Moreover, the descriptions of what Joseph did with the gun after drawing it also contradict the idea of surrendering it. See Paper 85-11 (holding gun in "low-ready" position); Paper 85-13 at AG923-AG924 (pointing gun at troopers); Paper 85-36 at 124, 126 (raising gun to chest-level). Because there is no factual support for Plaintiffs' theory, it fails to create a "genuine" issue of fact. Anderson, 477 U.S. at 248.

---

"continuously" statement could be referring to just the period of time when Joseph was behind the trees (if the statement is interpreted as a direct response to the question), or it could refer to the entire time the troopers had contact with Joseph (if the statement is interpreted as a general preamble or introduction to his answer). See Paper 87-11 at 121-22. By contrast, the only words Thomas could clearly remember saying when Joseph was behind the trees was that nobody needed to get hurt. Id. When Joseph was behind the trees, other troopers recall orders for him to show his hands, and fail to mention any orders to drop the gun. See, e.g., Paper 85-15 at AG898; Paper 85-12 at AG903; Paper 85-14 at AG907. Indeed, some evidence explicitly contradicts Plaintiffs' assertion that Thomas gave the command to Joseph when he was behind the trees. See Paper 85-30 at 91-92 (trooper Magnant recalling that no TSU members gave Joseph a command to drop the gun when Joseph was behind the trees).

Plaintiffs also dispute various background issues that bear on the degree of danger experienced by the troopers when Joseph drew his gun. In particular, they claim a genuine issue exists as to how much cover the troopers had when they advanced on Joseph. Defendants assert that the troopers were exposed in the open field, except for Snetsinger and Campagne, who "approached through a thin line of saplings to [Joseph's] left side." Paper 85-1 at 15. With Joseph using the trees for cover, the troopers' relative exposure put them at a tactical disadvantage, presumably increasing the danger they faced. Plaintiffs, by contrast, point to statements of a forensic investigator noting that Thomas's bullet casings were found in a "wooded area," Paper 87-2 at 17, with the implication that the troopers had substantial cover and faced less imminent danger. When read in context, however, the investigator's statement indicates only "very low brush," not actual woods. Paper 94-14 at 31. Also, as Defendants point out, the location of the casings is not necessarily the same as that of the troopers. Paper 94-21 at 158-60. For these reasons Plaintiffs' argument overstates the factual discrepancies. Even if there were a genuine factual dispute about the level of cover – open field versus low brush – it would not be material, because such a small difference would not change the reasonableness of Campagne and Thomas's decision to fire when faced with Joseph reaching for his gun in a threatening manner. See Estate of

<u>Sowards v. City of Trenton</u>, 125 F. App'x 31, 38-39 (6th Cir.
2005) (unpublished).  Similarly, Plaintiffs' effort to question
the distance between the troopers and Joseph fails to create a
material issue.  <u>See</u> Paper 87-2 at 18.  The troopers were well
within the range of Joseph's .22-caliber Beretta, and given
Joseph's threatening motion, the precise measurements are not
material in determining whether the officers reasonably perceived
an imminent danger.

Plaintiffs finally seek to avoid summary judgment by
claiming the police were dishonest and covered up the true facts
of Joseph's killing.  <u>See</u> Paper 87-2 at 13-18.  In particular,
Plaintiffs point to statements by police officers and others
immediately after the shooting that troopers shot Joseph because
he had opened fire on them.  <u>Id.</u>  Later police accounts dropped
this assertion.  <u>See, e.g.</u>, Paper 94-19 at 54-55.  Plaintiffs
call this a "cover-up," and believe it undermines the credibility
of all police evidence in this case.  Paper 87-2 at 16; Paper 99-
1 at 3.  Accordingly, Plaintiffs argue, a jury should have a
chance to decide whether and how much of the police evidence to
believe.  Paper 87-2 at 16; Paper 99-1 at 3.  Defendants point
out that the TSU members never described Joseph firing his gun in
their reports and depositions, and suggest the rumor may have
arisen from non-TSU officers misinterpreting radio traffic during

the incident (mistaking "shots fired" for "under fire"). <u>See</u>
Paper 94-1 at 14-15.

This Court disposes of Plaintiffs' "cover-up" argument for
several reasons. First, on these facts, the inference of bad
faith is too weak. As Defendants point out, there are many
possible ways for confusion and contradictory stories to develop,
most of which do not involve bad faith. Absent more, the
contradictory stories are not enough to raise a genuine issue of
bad faith. Second, even inferring bad faith and allowing a jury
to determine credibility would not change the legal outcome. The
police depositions and reports describing Joseph's shooting
generally hang together, as noted above, so even if a jury were
to credit only selective parts of the evidence – those most
favorable to Plaintiffs – the overall narrative would remain
largely unchanged. To reach a significantly different
conclusion, a jury not only would have to discredit the police
testimony, but would also need some other believable evidence.
In this case none exists. Finally, Defendants correctly note
that bad faith in itself does not affect Fourth Amendment
reasonableness, which is an objective inquiry. <u>See</u> <u>Graham</u>, 490
U.S. at 397. Plaintiffs' "cover-up" argument therefore fails to
change the analysis.

For these reasons, no genuine issue of material fact exists
regarding the events immediately surrounding the shooting, and

Plaintiffs' Fourth Amendment excessive force claim against Campagne and Thomas can be determined on summary judgment. Even viewing the facts in a light most favorable to Plaintiffs, it is clear that after Sgt. Snetsinger shot Joseph with a beanbag, he drew his gun and appeared ready to use it. Because the facts show an imminent threat of harm to the troopers, this Court finds Campagne and Thomas's decision to fire on Joseph was objectively reasonable and did not violate the Fourth Amendment. See Salim, 93 F.3d at 92 ("In such circumstances, no rational jury could find [the police officer's] decision to use deadly force 'was so flawed that no reasonable officer would have made a similar choice.'" (quoting Lennon v. Miller, 66 F.3d 416, 425 (2d Cir. 1995))). As a result, Defendants Campagne and Thomas are entitled to qualified immunity, and the Court grants Defendants' Motion for Summary Judgment with respect to Plaintiffs' Fourth Amendment claims in Count I.

B.    Fourth Amendment Claims for Shooting Joseph with Beanbags

Count II alleges that Defendants Hill and Snetsinger used excessive force when they shot Joseph with beanbags, violating his Fourth Amendment rights. Non-lethal force is subject to the same "objective reasonableness" standard under the Fourth Amendment as deadly force. Scott, 550 U.S. at 382-83. The facts, however, must demonstrate a correspondingly lower level of exigency in order to be "reasonable." Id. Defendants assert

qualified immunity, Paper 85-1 at 30-33, so this Court's first task is to determine whether a constitutional violation occurred. Pearson, 129 S. Ct. 808.

Plaintiffs do not argue that a genuine issue of material fact exists with respect to the beanbag shootings and surrounding circumstances, Paper 87-2 at 19-23, and the facts are essentially undisputed. Thus, Count II is subject to resolution on summary judgment. Plaintiffs instead assert that shooting Joseph with beanbags was not objectively reasonable as a matter of law. Id. They point out Joseph did not have a visible weapon at the time Hill shot him, nor was Joseph combative or assaulting the troopers. Id. They also note the Vermont State Police's use of force policy, under which a subject generally should be combative or assaulting the police before beanbag shotguns are used.[7] See Paper 87-19 at 88-90; Paper 94-2.

Defendants highlight different facts, arguing that Hill and Snetsinger's use of force was reasonable. Paper 85-1 at 24-27.

---

[7] Plaintiffs additionally refer to the International Association of Chiefs of Police Training Key No. 274, which recommends ways to approach mentally disturbed individuals. Paper 87-28. The IACP guidelines, however, are not particularly useful in resolving the question of reasonableness here. Training Key No. 274 recommends approaching mentally ill individuals in non-threatening ways, so as to not excite them. Id. at 3. Yet the Training Key also states that "physical restraint is sometimes necessary" and officers may need to use force – though they should "use only as much force as necessary." Id. at 4. Taken together, these instructions do not answer the underlying question of when force is and is not necessary.

In particular, they point out that Joseph was known to have threatened his family with a gun earlier that day, so troopers were operating on the assumption that he was still armed.  Id. Joseph had already rummaged around in his car by the time the first beanbag shots hit him, strengthening the inference that he was armed.[8]  Id. at 24.  Troopers also knew Joseph had resisted previous attempts to take him into custody.  Id.  Throughout, he was disobeying orders, and when Snetsinger shot him, Joseph was taking cover behind a tree, which gave him a tactical advantage against the troopers.[9]  Id.

Viewing the facts in a light most favorable to Plaintiffs, a jury could find Snetsinger and Hill's actions objectively unreasonable.  Joseph's threat to kill his brother was eight or nine hours earlier, and, per Salim, could be disregarded as not part of the circumstances "immediately prior to" the incident. See O'Bert, 331 F.3d at 39-40 (using logic of Salim to disregard plaintiff's verbal threat against police, which occurred at an earlier point in time).  And although the troopers suspected

_____

[8] Hill apparently fired his first beanbag round at Joseph before Joseph had reached the car, spurring Joseph to run into the woods.  Paper 85-30 at 49.  This round missed, however, and is not the basis of Plaintiffs' excessive force claim.

[9] Defendants also mention Joseph trying to access his car – which could contain weapons, or could be a vehicle for escape or causing harm – but all shots that hit Joseph were fired after Joseph had finished rummaging around in his car.  See Paper 85-26.

Joseph was armed at the time Hill shot him (and knew so at the
time Snetsinger shot him), Joseph was never acting combative and
never threatened to use his weapon.  To the extent that a jury
could find that shooting Joseph with beanbags was unreasonable,
this Court should resolve the first prong of qualified immunity
analysis in Plaintiffs' favor.  <u>Cf.</u> <u>Woodward v. Town of</u>
<u>Brattleboro</u>, 148 F. App'x 13 (2d Cir. 2005) (unpublished)
(reversing a grant of summary judgment to defendants where
appellate court believed this Court had failed to consider all
facts favorable to plaintiff).

But even if this Court finds a Fourth Amendment violation,
the Defendants are entitled to qualified immunity on the second
prong.  Judge Sessions recently laid out the second step as
follows:

> The second step of the qualified immunity analysis asks
> whether the officials' actions violated "clearly
> established statutory or constitutional rights of which
> a reasonable person would have known." <u>Jones v.</u>
> <u>Parmley</u>, 465 F.3d 46, 55 (2d. Cir.2006) (quoting <u>Hope</u>
> <u>v. Pelzer</u>, 536 U.S. 730, 739 (2002)).  "A right is
> clearly established if (1) the law is defined with
> reasonable clarity, (2) the Supreme Court or the Second
> Circuit has recognized the right, and (3) a reasonable
> defendant [would] have understood from the existing law
> that [his] conduct was unlawful." <u>Anderson v. Recore</u>,
> 317 F.3d 194, 197 (2d Cir.2003).  The right must be
> clearly established "in light of the specific context
> of the case." <u>Saucier</u>, 533 U.S. at 201.  The focus of
> this inquiry is on "whether it would be clear to a
> reasonable officer that his conduct was unlawful in the
> situation he confronted." <u>Id.</u> at 202.

Keene v. Schneider, No. 2:07-CV-00079, 2007 WL 2463270, at *4 (D.
Vt. Aug. 28, 2007) (alterations in original).  "The right of an
individual not to be subjected to excessive force has long been
clearly established," Calamia v. New York, 879 F.2d 1025, 1036
(2d Cir. 1989), so the inquiry in this case comes down to whether
Snetsinger and Hill's mistake – believing it was reasonable to
shoot Joseph with beanbag rounds when in fact it was not – was
itself reasonable.[10]

As described above, the facts in this case make it a close
question whether Snetsinger and Hill used excessive force in
shooting Joseph with beanbag rounds.  Because the question is
rather close, this Court finds Snetsinger and Hill's mistake a
reasonable one, and accordingly grants them qualified immunity.[11]

_____

[10] The second step of qualified immunity "inherently makes
for confusion," because the inquiry "looks to the reasonableness
of an officer's belief that he acted lawfully after the officer
is found to have been unreasonable in his conduct." Stephenson
v. Doe, 332 F.3d 68, 80 n.15 (2d Cir. 2003).  Nevertheless, the
Supreme Court in Saucier clearly intended the second step of the
inquiry to mean something different from the first, and to create
an additional level of deference to law enforcement officers.
See Saucier, 533 U.S. at 202.

[11] In arguing against this conclusion, Plaintiffs rely
primarily on Deorle v. Rutherford, 272 F.3d 1272 (9th Cir. 2001),
an out-of-circuit case with facts roughly similar to ours.  In
Deorle, as here, the plaintiff was mentally unstable, was
ignoring police orders, yet was not aggressively threatening the
police (although the plaintiff had made sporadic verbal threats
earlier).  As the plaintiff walked toward a police officer, the
officer fired a shotgun beanbag round.  The round went off-target
and hit the plaintiff in the eye, causing severe injury.  The
Ninth Circuit viewed the facts most favorably to the plaintiff,
found excessive force, and denied qualified immunity at both

See Saucier, 533 U.S. at 206 ("Qualified immunity operates . . .
to protect officers from the sometimes 'hazy border between
excessive and acceptable force.'" (quoting Priester v. Riviera
Beach, 208 F.3d 919, 926-27 (11th Cir. 2000))).  As a result,
this Court grants summary judgment to Defendants with respect to
the Fourth Amendment claims in Count II.

    C.   Fourth Amendment Claims for Authorizing the TSU

    In Count IV, Plaintiffs allege Sgt. Todd Protzman and
Captain Walter Goodell violated Joseph's Fourth Amendment right
to be free of excessive force when they activated the TSU.
Defendants move for summary judgment on this claim, arguing that
the Fourth Amendment does not cover a decision to use SWAT-type
units, and even if it did, the decision was objectively
reasonable in this case.[12]  Paper 85-1 at 20-24.

---

steps of the inquiry.  Id. at 1286.
    While that case provides a useful reference point, its
outcome is not controlling because the main facts on which the
Ninth Circuit relied are not analogous to this case.  In Deorle,
the plaintiff had committed no serious crime or threatened to
hurt anyone but himself, he was effectively contained by
encircling police, and he posed no serious threat to the
officers.  Id. at 1285.  In this case, Joseph threatened to kill
his brother earlier that day, was suspected (and later known) to
be armed with a handgun, known to be capable of using it, acting
erratically, and had resisted the police in the past.  On these
facts, the question of reasonableness is much closer than that in
Deorle, and to the extent Snetsinger and Hill made a mistake, it
was a reasonable one.

    [12] Defendants also argue that as a factual matter, Sgt.
Protzman's role was simply to "notify Captain Goodell of the
situation and present facts to him."  Paper 85-1 at 21.  Because
Protzman "did not have the authority to activate the TSU, and []

As this Court noted in ruling on Defendants' motion to dismiss, Second Circuit law is unclear on whether the Fourth Amendment encompasses the decision to activate a SWAT team. Paper 19 at 11-13. The Tenth Circuit has recognized a Fourth Amendment claim based on the decision to use a SWAT team, reasoning that "[t]he decision to deploy a SWAT team . . . necessarily involves the decision to make an overwhelming show of force – force far greater than that normally applied in police encounters with citizens." Overdorff ex rel. Holland v. Harrington, 268 F.3d 1179, 1190 (10th Cir. 2001). The court in Harrington continued:

> The decision to use a SWAT team to make a "dynamic entry" into a residence constitutes conduct "immediately connected with the seizure" because it determines the degree of force initially to be applied in effecting the seizure itself. If, as Garner instructs, "it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out," 471 U.S. at 8, 105 S.Ct. 1694, then the decision to deploy a SWAT team to execute a warrant must be "reasonable" because it largely determines how the seizure is carried out, thereby determining the extent of the intrusion on the individual's Fourth Amendment interests.

Id. Accordingly, the Tenth Circuit held that the decision to use a SWAT team should be evaluated under the Fourth Circuit's objective reasonableness standard. Id. (citing Garner, 471 U.S.

---

had no role in planning their mission," Defendants urge summary judgment with respect to Protzman. Id. This issue need not be addressed because, as explained above, Plaintiffs' claim fails due to qualified immunity.

at 8).  The Third Circuit agreed.  See Estate of Smith v. Marasco, 430 F.3d 140, 149-50 (3d Cir. 2005); Estate of Smith v. Marasco, 318 F.3d 497, 516-18 (3d Cir. 2003).

The parties have pointed to no Second Circuit cases addressing this issue; one district court within the Second Circuit has taken the Tenth/Third Circuit approach.  Citing Harrington and Marasco, the District of Connecticut evaluated a Fourth Amendment claim based on authorizing the use of a SWAT team, and denied the defendants' motion for summary judgment. Warren v. Williams, No. 304CV537, 2006 WL 860998, at *27-30 (D. Conn. Mar. 31, 2006).

Defendants argue against the Tenth/Third Circuit approach, claiming the logic of Harrington and Marasco conflicts with the Second Circuit's holding in Salim that claims for "creat[ing] a situation in which the use of [] force bec[omes] necessary" are not cognizable under the Fourth Amendment.  Salim, 93 F.3d at 92. Defendants also point to Seventh and Eighth Circuit cases holding the Fourth Amendment covers only seizures, not events leading up to seizures, Cole v. Bone, 993 F.2d 1328, 1333 (8th Cir. 1993), and that the Fourth Amendment "does not require officers to use the least intrusive or even less intrusive alternatives in search and seizure cases," Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir. 1994).  See Paper 85-1 at 20-21.  As a result, Defendants

conclude, the decision to activate a SWAT team cannot be the basis for a Fourth Amendment excessive force claim.  Id.

Defendants' arguments do not foreclose the Tenth/Third Circuit approach, even in light of Salim.  As an initial matter, Salim's holding (that creating the need for force is irrelevant under the Fourth Amendment) was called into question by recent Supreme Court precedent.[13]  And even if Salim remains good law, the Fourth Amendment claim in that case was based solely on the act of shooting the plaintiff; there was no claim based on authorizing an excessive level of force against the plaintiff. The Seventh and Eighth Circuit cases cited by Defendants are out-of-circuit and simply represent general propositions.  They do not necessarily dictate an outcome to the specific question of whether authorizing a SWAT team can form the basis for a Fourth Amendment claim, in this circuit.  See Warren, 2006 WL 860998, at *27-30.

---

[13] In Scott v. Harris, the suspect's actions helped create the need for force, as he refused to surrender and led the police on a high-speed chase through a populated area.  Scott, 550 U.S. at 372.  In the course of scrutinizing the objective reasonableness of the police's use of force, the Supreme Court explicitly stated that "[c]ulpability is relevant."  Id. at 384 n.10 (emphasis in original).  The Court found the use of force to be reasonable, based at least in part on the suspect having created the need for it.  Id. at 384.  This logic could easily be applied in reverse to a situation where the police created the need for force, making the use of force by police correspondingly less reasonable.  Because Scott's language is relatively narrow, and the logic needs a slight extension to apply in reverse, Scott clearly does not overrule Salim directly.  It at least calls into question, however, the breadth of Salim's holding.

In any event, this Court need not resolve the question of whether authorizing a SWAT team is cognizable under the Fourth Amendment, because even if it were, Protzman and Goodell would not be liable for authorizing the TSU.  Assuming such a claim is possible, the objective reasonableness standard applies, as does the usual qualified immunity framework.  See Harrington, 268 F.3d at 1190; Marasco, 430 F.3d at 149.  Thus, for the first prong of qualified immunity analysis, this Court asks whether Protzman and Goodell's actions were objectively reasonable.

Plaintiffs attempt to create a genuine issue of material fact with respect to reasonableness by asserting that Protzman and Goodell were motivated by personal animosity toward Robert Fortunati, Joseph's father, when they authorized the TSU.  Paper 87-2 at 26-27.  This fails to create a material issue, however, because Fourth Amendment reasonableness is an objective concept, evaluated without respect to the officers' "underlying intent or motivation."  Graham, 490 U.S. at 397.  Even if Protzman and Goodell were motivated by personal animosity, so long as the objective facts of the situation justified using the TSU, their act would be reasonable.  Id.  Thus, Plaintiffs fail to show a genuine issue of material fact and the claim can be resolved on summary judgment.

As to whether it was reasonable to authorize the TSU, facts before the Court cut both ways.  On the one hand, the police knew

Joseph was armed and unstable, and had threatened to kill members of his family earlier in the day. Paper 85-24 at 60-63. The police were explicitly warned by Robert Fortunati that Joseph was capable of shooting them, and even regular bulletproof vests might not be enough to protect the police. Paper 85-4; Paper 85-33 at 14. Joseph was also located in the woods, a tactically difficult situation for which regular Vermont State Police troopers were not trained. Paper 85-24 at 65-67. On the other hand, the police knew Joseph was mentally ill, Paper 87-4 at 63, Paper 85-33 at 26-27, 127, he was not actively threatening anyone at that moment, Paper 87-4 at 118-21, the area was fairly remote, Paper 85-33 at 24-25, and the only people he had threatened were his family, who had actively approached him, id. at 135.

Viewing the facts most favorably to Plaintiffs, a jury could find the decision to use the TSU unreasonable. It is a close call, because the police knew Joseph had a weapon and was unstable, but a jury could weigh the facts, note Joseph was not actively threatening anyone, and conclude a lower degree of force was warranted.

On the second prong, however, Protzman and Goodell receive qualified immunity. Because the facts make reasonableness a close question, to the extent Protzman and Goodell made a mistake, the mistake itself was reasonable. See Saucier, 533 U.S. at 206; Marasco, 430 F.3d at 150. In addition, the law is not

"clearly established" to the level of specificity required.
Saucier, 533 U.S. at 201.  The general right to be free of
excessive force is well-established, see Graham, 490 U.S. at 386,
but the "more particularized" question of whether authorizing a
SWAT team can constitute excessive force is not clear in this
circuit.  Saucier, 533 U.S. at 202.  As a result, Protzman and
Goodell are entitled to qualified immunity, see Pearson, 129 S.
Ct. at 823, and the Court grants summary judgment to Defendants
on the Fourth Amendment claims in Count IV.

    D.   State Law Gross Negligence Claims

Plaintiffs assert state law claims for gross negligence in
Counts I, II, and IV, based on the same underlying facts:
shooting Joseph with bullets, shooting Joseph with beanbags, and
authorizing the TSU, respectively.  On this motion for summary
judgment, the parties have devoted very little time to
Plaintiffs' state law claims.[14]

Under Vermont law, gross negligence requires the usual
negligence elements: duty, breach, causation, and damages.
Powers v. Office of Child Support, 795 A.2d 1259, 1265 (Vt.
2002).  In showing breach, a plaintiff must provide "facts that
demonstrate that an individual defendant heedlessly and palpably
violated a legal duty owed to plaintiff."  Id. at 126 (citing

---

[14] With over 100 pages of total briefing and approximately
1000 pages of total filings, each side devotes only one paragraph
to Plaintiffs' state law claims.

Mellin v. Flood Brook Union Sch. Dist., 790 A.2d 408, 423
(2001)).  Ordinary carelessness does not suffice; the breach must
"'amount[] to a failure to exercise even a slight degree of
care,'" in order to prevail on a claim of gross negligence.
Hardingham v. United Counseling Serv., Inc., 672 A.2d 480, 482
(1995) (quoting Rivard v. Roy, 196 A.2d 497, 500 (1963)).

Gross negligence is usually a question for the jury, but
courts can resolve gross negligence claims on summary judgment if
"reasonable persons cannot differ on the question" of whether the
facts meet the legal standard.  Id. at 1266 (citing Hardingham,
672 A.2d at 482).  Here, summary judgment is appropriate, as the
facts are essentially undisputed, and Plaintiffs fail to make out
a claim for gross negligence as a matter of law.

As an initial matter, it is unclear what duty the Defendants
owed to Joseph, in their actions as law enforcement agents.  Cf.
Powers, 795 A.2d at 1265-66 (finding no duty owed by employees of
state agency to persons served by the agency).  Plaintiffs' brief
fails even to mention the elements of gross negligence, much less
a specific duty that was breached.

Even assuming Defendants had a duty of care toward Joseph,
their conduct simply does not rise to the level of culpability
required for gross negligence.  The facts of this case show a few
questionable decisions, some perhaps preferable alternatives that
were not pursued, and a generally force-oriented approach.  This

does not amount to the wholesale abdication of care required for gross negligence. Cf. id. ("What is alleged in [the] complaint is simple incompetence, inaccurate record keeping, and clerical errors. Such claims do not rise to the level of gross negligence"). Thus, Defendants are entitled to summary judgment on the gross negligence claims in Counts I, II, and IV.

E.    Claims Based on the Fortunati Family's Arrest

Count III of the Complaint appears to allege claims for false arrest and false imprisonment under both Vermont state law and the Fourth Amendment, based on the handcuffing and arrest of Robert, Susan, and Mark Fortunati on the evening of June 24, 2006. On this motion, neither party clarifies these claims, and the only legal proposition advanced is that if Defendants had probable cause for arresting the Fortunatis, Plaintiffs' claims must fail. See Jenkins v. City of New York, 478 F.3d 76, 84 (2d Cir. 2007).

In any event, the Court denies summary judgment with respect to Count III because several genuine issues of material fact exist. Plaintiffs offer an affidavit from Robert Fortunati that relates a significantly different version of the facts than described in the police evidence. Compare Paper 87-6 (stating that there was no roadblock, the Fortunatis were not speeding, they were not aggressive or hostile, and they did not disobey orders) with Paper 85-7 (stating that there was a roadblock, the

34

Fortunatis approached in a reckless manner, they were yelling at the police, and they disobeyed commands). In the face of this factual dispute, summary judgment is inappropriate. Fed. R. Civ. P. 56(c).

        F. "Wrongful Death" Claim

In Count V of their Complaint, Plaintiffs allege "Wrongful Death" against Protzman, Goodell, Snetsinger, Hill, Campagne, and Thomas. At the motion to dismiss phase, the parties appeared to treat this count as alleging a separate cause of action, see Paper 13 at 17-18; Paper 17-2 at 21-22, and this Court did so as well, see Paper 19 at 16-17. Vermont's wrongful death statute, however, does not create a new type of legal claim. It simply gives a right of recovery to a decedent's estate based on the injury to the deceased. Vt. Stat. Ann. tit. 14, § 1491 (2008). The decedent's estate must still allege and prove a traditional claim for injury – in state tort law or otherwise – in order to recover. See, e.g., Clymer v. Webster, 596 A.2d 905, 909 (Vt. 1991) ("[Vermont's wrongful death act]. . . does not create a new cause of action, but rather a new right of recovery or new element of damages engrafted upon the already existing cause of action." (internal quotations omitted)); Berry v. Rutland Ry. Co., 154 A. 671, 672 (Vt. 1931) (noting that Vermont's wrongful death statute "does not give a new right of action, but a new right of recovery, not existing at common law, arising from the

injury to the deceased which gave or would have given him a right of action if death had not ensued"); Legg v. Britton, 24 A. 1016 (Vt. 1892). Because Vermont's wrongful death statute does not create a new legal theory for recovery, Defendants' Motion for Summary Judgment is granted with respect to Count V.[15]

IV. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED with respect to Plaintiffs' claims based on Joseph's injuries and death (Counts I, II, and IV). Defendants' motion is also GRANTED with respect to Plaintiffs' "wrongful death" allegations in Count V. Defendants' motion is DENIED, however, with respect to Plaintiffs' claims based on the Fortunati family's arrest (Count III).

Dated at Brattleboro, in the District of Vermont, this 29th day of December, 2009.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
Senior United States District Judge

---

[15] Vermont's wrongful death statute could have been relevant in determining damages, if Plaintiffs had established liability for Joseph's injury and death, but it adds nothing at the stage of determining liability. Clymer, 596 A.2d at 909.