UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


ROBERT A. FORTUNATI, ADMINISTRATOR :
OF THE ESTATE OF JOSEPH FORTUNATI; :
ROBERT A. FORTUNATI, SUSAN         :
FORTUNATI; AND MARK FORTUNATI,     :
                                   :
          Plaintiffs,              :
                                   :
                                   :
     v.                            :   File No. 1:07-cv-143-jgm
                                   :
ANDREW CAMPAGNE, MARC THOMAS,      :
JEREMY HILL, TODD PROTZMAN,        :
ROB SNETSINGER, KARL GARDNER,      :
HUGH O'DONNELL, MIKE DUDLEY        :
and WALTER GOODELL,                :
                                   :
          Defendants.              :
_____    :

OPINION AND ORDER
(Doc. 157)

Defendant Vermont State Police troopers Todd Protzman, Rob Snetsinger, Karl Gardner, Hugh O'Donnell, and Mike Dudley renew their motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) on grounds of qualified immunity. (Doc. 157.)


I.  Introduction

At 7:11 p.m. on June 24, 2006, Joseph Fortunati was killed as Vermont State Police troopers attempted to apprehend him in a tense, armed stand-off in Corinth, Vermont. Joseph, who was bi-polar, schizophrenic, and had not been taking his medication, threatened the troopers with his gun as they attempted to bring

him into custody.   Three members of Joseph's family drove to the scene of the shooting three hours later, where they were detained at gunpoint and placed in handcuffs.

Members of Mr. Fortunati's family filed suit in federal court on behalf of Joseph's estate and in their personal capacities, asserting claims under 42 U.S.C. § 1983 for violation of Joseph's civil rights by use of excessive deadly force and unreasonable seizure, for violation of Robert, Susan and Mark Fortunati's civil right to be free from unreasonable seizure by their wrongful arrest, as well as a Vermont state law claim for wrongful death.   Defendants filed a motion to dismiss, which this Court granted in part and denied in part on January 25, 2008. (Doc. 19.)   On December 29, 2009, this Court ruled on the remaining Defendants' Motion for Summary Judgment and dismissed all remaining claims except the 42 U.S.C. § 1983 claims for false arrest brought by Robert, Susan and Mark Fortunati.   (Doc. 101.)

A four-day jury trial on the family members' false arrest claims began on June 14, 2010.   At the close of Plaintiffs' case, and at the close of evidence, Defendants moved for judgment as a matter of law on grounds there was insufficient evidence of a false arrest and Defendants, in any case, were entitled to qualified immunity.   The motions were denied and the case was

submitted to the jury.[1]  The jury reached a verdict in favor of Defendants with respect to Robert Fortunati's false arrest claim, but was unable to reach a verdict regarding Susan and Mark's claims.

Defendants now move under Rule 50(b) for judgment as a matter of law on grounds of qualified immunity for Susan and Mark's false arrest claims.  For the reasons that follow, Defendants are entitled to judgment as a matter of law, on grounds there is no evidence of Karl Gardner's personal involvement in Susan and Mark's detention, and the remaining Defendants are entitled to qualified immunity.

II.  Background

Susan and Mark's false arrest claims are based on their detention by Vermont State Police when they drove to the scene of Joseph Fortunati's shooting.  The facts surrounding the shooting are described in detail in the Court's January 25, 2008 Ruling on Defendants' Motion for Summary Judgment (Doc. 101), familiarity with which is assumed, and they are only briefly recounted here to provide context.  Facts surrounding the family's encounters with Vermont State Police both before and after the shooting were

---

[1] It was undisputed at trial that Robert was arrested.  The jury was not instructed regarding Defendants' qualified immunity.

adduced at trial and are recounted in relevant part below.[2]  The family's recollection of the incident differs from that of the troopers, and where recollections conflict, this Court will consider the evidence, and draw reasonable inferences, favoring the Plaintiffs in determining whether that evidence is sufficient to overcome the defense of qualified immunity.

On the morning of June 24, 2006, Robert Fortunati and his wife, Susan, accompanied by Robert's son, Robert Jr., drove to Copper Mine Road in Corinth, Vermont, in an attempt to persuade Robert's son, Joseph, to move his camp from Copper Mine Road to a more isolated location.  They were concerned about Joseph because, the day before, Joseph had frightened environmental workers taking water samples on Copper Mine Road, and the workers had reported the incident to Vermont state troopers.  When the family arrived at Joseph's campsite, however, Joseph threatened his brother at gunpoint and told his family to leave.  (S. Fortunati Test. 12, June 15, 2010.)  Robert Fortunati recounted

---

[2] This Court's immunity decision relies on the record at trial, and any additional facts not adduced at trial that appear in the summary judgment record are recounted to provide background and context.  "Once trial has been had . . . the availability of official immunity should be determined by the trial record, not the pleadings nor the summary judgment record." Ortiz. v. Jordan, __ S. Ct. __, 2011 WL 197801, at *3 (Jan. 24, 2011) (quoting 15A C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure § 3914.10, p. 684 (2d ed. 1992 and Supp. 2010)).  The Defendants here did not assert a qualified immunity defense with respect to the false arrest claims in their summary judgment motion papers prior to trial.

that morning's incident to state police and offered his help.
Soon thereafter shift commander Sgt. Todd Protzman requested
activation of the Tactical Services Unit (TSU), a SWAT-type unit
within the Vermont State Police. (Protzman Test. 44, 50, June
14, 2010.)

TSU members were briefed at the barracks regarding the plan
to take Joseph into custody.  In addition to the risks involved
in taking Joseph into custody, each of the Defendants recalled a
discussion of potential risks posed by members of Joseph's
family, should they become involved.  Trooper O'Donnell recalls
troopers were concerned the family would alert Joseph to the
mission to take him into custody if they were informed of it
beforehand, and that there was concern regarding the possibility
the family may retaliate after the mission.  (O'Donnell Test. 96-
97, 100, June 15, 2010.)  Sergeant Protzman, who had interacted
with Robert in 1998 when Robert reported finding marijuana
growing on his property, briefed the troopers regarding Robert's
past statements expressing dislike of state police and informed
them he believed Robert's temperament was unpredictable, and they
should be cautious in dealing with him. (Protzman Test. 60, 100.)
Protzman also had second-hand information from a concerned
citizen that Robert once stated he would shoot and kill a
trooper, if given the opportunity.  (Protzman Test. 98-99.)
Sergeant Protzman voiced concern that Robert could potentially

come to the scene and become adversarial.  (Protzman Test. 51.)
Sergeant Rob Snetsinger recalled troopers were told Robert was
someone who may react violently, had a documented dislike for
Vermont State Police, and possessed firearms. (Snetsinger Test.
171, 173, June 14, 2010).

Shortly before 7:00 p.m. on June 24, 2006, the TSU deployed
near Joseph's campsite on Copper Mine Road with back-up, canine,
and hostage negotiations units for support.  Seven members
advanced toward the campsite dressed in camouflage and face
paint, and equipped with assault rifles, tasers, and shotguns
with beanbag ammunition.

Attempts to speak with Joseph, to order him to show his
hands and remain still, and to subdue him with beanbag rounds
failed.  Joseph ran into the woods and circled to his car, where
he likely retrieved a gun.  As troopers converged on him, Joseph,
now armed, refused repeated orders to put his gun down, and when
he reached for the gun in his waistband and pulled it out, two
troopers fired three shots, two of which killed him.  Joseph died
at 7:11 p.m.  (S. Fortunati Test. 18.)

Meanwhile, during the mission, two troopers were at the
Fortunati residence speaking with three members of Joseph's
family – Robert, Susan, and another of Joseph's brothers, Mark
Fortunati.  (Protzman Test. 63; Clark Test. 6, June 15, 2010.)

After Joseph was killed, the troopers received a page and left the residence.  (S. Fortunati Test. at 15-16; Clark Test. 11.)

A few minutes before ten o'clock that night, Robert Jr. called Robert, Susan, and Mark Fortunati to inform them of Joseph's death.  (S. Fortunati Test. 17-18.)  Upon hearing the news, the three Fortunatis drove toward Copper Mine Road in Robert's truck.  Id. at 19.

Meanwhile, after the shooting, Vermont State Troopers Dudley, Gardner, O'Donnell and Snetsinger had taken up post near Ridge Lane on Copper Mine Road to secure the scene of the shooting.  (Snetsinger Test. 171.)  Two police cruisers were parked at the side of the road – one of them perpendicular to the lane of travel, the other past the first, along the edge of the road and out of the travel lane, although its exact position is disputed.  (S. Fortunati Test. 59-62.)  Troopers Snetsinger and O'Donnell, who had participated in the mission, were in camouflage, with black and green paint on their faces, and armed with MP5 submachine guns.  (Snetsinger Test. 172.)  The remaining troopers were in uniform and armed with service weapons.  Their post was approximately a quarter mile from the scene of the confrontation with Joseph Fortunati.  Shortly before the Fortunatis arrived, Sgt. Protzman joined the troopers at the post and told them Joseph's family had learned of the incident and there was a possibility they would come to the scene.  (Protzman

7

Test. 68.)  At approximately 10:15 p.m., the troopers saw the headlights of a pick-up truck approaching their post.  (Protzman Test. 69.)

Susan Fortunati recalls that Robert was driving on Copper Mine Road at approximately 30 miles an hour as the family approached.  Mark was in the front passenger seat, and Susan was in the middle of the back seat.  (S. Fortunati Test. 20.)

The scene appeared dark to Susan as the truck came upon the two marked police cruisers.  (Id. at 25.)  The cruisers' flashing lights were not activated, although a cruiser's spotlight was illuminating the canopy of trees above the road and the cruiser's reflective markings could be seen.  (Id. at 55; Snetsinger Test. 199; M. Fortunati Test. 7, June 15, 2010.)  Sergeant Protzman testified the parking lights for one cruiser were on, and the headlights for the second were also on.  (Protzman Test. 101.) Although troopers testified the truck was speeding as it approached them and veered or swerved around the parked cruiser making an abrupt stop and short skid, according to Susan and Mark, their truck slowed to a normal stop after passing the first cruiser, without veering.  (S. Fortunati Test. 24, 26, 28; M. Fortunati Test. 8-10.)  The truck headlights illuminated the area.

Contrary to the troopers' testimony they had to move out of the truck's way as it approached, and Protzman's testimony that

8

the truck almost ran over his foot (Protzman Test. 87, 105),
Susan recalls only that someone crossed the road diagonally in
front of the truck after it had stopped. (S. Fortunati Test. 25-
26.)  Mark recalled seeing an officer twenty feet ahead signaling
for the truck to stop. (M. Fortunati Test. 10.)  Trooper
O'Donnell testified he was yelling for the vehicle to stop.
(O'Donnell Test. 107.)

When the truck stopped, Robert exited and moved along the
side of the cruiser parked perpendicular to the road.  (S.
Fortunati Test. 33.)  He took a few steps towards Sgt.
Snetsinger.  (Snetsinger Test. 183.)  Snetsinger testified Robert
was shouting that the troopers had killed his son, he did not
obey orders to stop and return to his truck, and Snetsinger
believed he was agitated and potentially assaultive.  (Id. at
184, 204-05.)  Sergeant Protzman recalls Robert was agitated and
asked Snetsinger why he had killed his son.  (Protzman Test. 77,
107.)  Snetsinger immediately turned Robert around, pressed him
into the driver's side of the truck and requested assistance with
handcuffs.  (Snetsinger Test. 185.)  Trooper Gardner assisted in
handcuffing Robert.  (Gardner Test. 36, June 15, 2010.)

Susan recalls the commotion on the driver's side of the
truck, and someone standing outside the passenger side screaming
at her to put her hands up. (S. Fortunati Test. 33-34.)  Susan
and Mark recall looking at the barrel of an assault weapon.

9

(Id.; M. Fortunati Test. 15.)  The second time Susan was ordered to put her hands up, she complied and told Mark to do the same. (S. Fortunati Test. 34.)  Next, Susan and Mark were ordered out of the truck by Officer Dudley, and they exited with their hands up.  (Id. at 35; R. Fortunati Test. 63.)  According to Susan, the two troopers on the passenger side of the truck, Dudley and O'Donnell, had their weapons pointed at Susan and Mark.  (S. Fortunati Test. 35.)  Susan testified she was concerned about Robert and "hollered" to him three times to see if he was alright.  (Id.; R. Fortunati Test. 19.)  Susan and Mark were then ordered to turn around and put their hands behind their back. (O'Donnell Test. 111.)  Snetsinger testified he ordered Mark and Susan cuffed to maintain control of everyone at the scene, and because Mark and Susan were potentially in the early stages of behaving dangerously or aggressively.  (Snetsinger Test. 187-88, 207.)  Susan and Mark were handcuffed by Protzman and Dudley, respectively (Dudley Test. 137, June 15, 2010), Protzman patted them down (Protzman Test. 81), and they were then told to stand and stay beside the truck (S. Fortunati Test. 35, 37, 41).

Protzman conducted a cursory search of the truck's open cockpit and the lunge area where the driver could reach. (Protzman Test. 82.)  After Susan was cuffed, she recalls asking if she was under arrest.  She was told she was not.  She asked why she was handcuffed, and testified that the troopers responded

10

"because we don't know you people."  (S. Fortunati Test. 36.)
Sergeant Snetsinger testified that Mark and Susan were placed in
protective custody, and handcuffs were necessary for officer
safety and controlling the scene.  (Snetsinger Test. 208.)
According to Susan and Mark, the troopers kept their weapons
trained on the Fortunatis for at least five minutes.  (S.
Fortunati Test. 36-37; M. Fortunati Test. 16.)   Trooper O'Donnell
testified that once the Fortunatis were in handcuffs, the
troopers' weapons were lowered and he joined the troopers
handling Robert on the other side of the truck.  (O'Donnell Test.
126.)  Dudley, who was dressed in his patrol uniform, testified
he did not recall drawing his handgun on Mark and Susan.  (Dudley
Test. 140.)

     When the troopers decided to charge Robert with negligent
driving and resisting arrest and prepared to transport Robert to
St. Johnsbury for processing, they uncuffed Susan and Mark, who
both returned home in Robert's truck.  (S. Fortunati Test. 38-
39.)  Susan believed they drove away from the scene at
approximately 11:20 p.m., because she recalled returning home at
11:30.  (Id. at 49.)  According to Robert Fortunati, Susan and
Mark had been handcuffed for between 20 to 30 minutes.  (R.
Fortunati Test. 65.)  Dudley, on the other hand, recalls
uncuffing Mark after ten to twelve minutes elapsed.  (Dudley

Test. 139.)  The charges against Robert were dropped
approximately one month after the incident.

## III.  Discussion

A.  Insufficient Evidence of Trooper Gardner's Personal Involvement

There is no evidence in the record Karl Gardner had any
contact with either Susan or Mark Fortunati or issued any orders
regarding their detention.  "Personal involvement of defendants
in alleged constitutional deprivations is a prerequisite to an
award of damages under § 1983."  Wright v. Smith, 21 F.3d 496,
501 (2d Cir. 1994).  Trooper Gardner handcuffed and arrested
Robert Fortunati, but had no verbal or physical contact with Mark
and Susan.  See generally, Gardner Test., June 15, 2010
(indicating Gardner was involved only in arresting Robert
Fortunati).  He is therefore entitled to judgment as a matter of
law.  Even if he were personally involved, he would be entitled
to qualified immunity for the reasons that follow.

B.  Insufficient Evidence to Overcome Qualified Immunity Defense for Remaining Defendants

The unlawfulness of Susan and Mark's detention in this case
was not clearly established, and the remaining Defendants are
entitled to qualified immunity.  It would not be clear to a
reasonable officer in the Defendants' position, following a
deadly confrontation with Joseph Fortunati, and having been

12

briefed with information suggesting family members' reaction may pose a danger to troopers, that stopping the truck, ordering the Fortunatis out at gunpoint, and then temporarily placing them in handcuffs, was unlawful in the unique situation they confronted. The troopers had just ended a tense standoff with an armed schizophrenic, were charged with securing the scene, and had information regarding potential dangers posed by the Fortunatis' reaction to the incident.

     i.   <u>Applicable Law</u>

A renewed motion for judgment as a matter of law may address "a jury issue not decided by a verdict." Fed. R. Civ. P. 50(b). Judgment as a matter of law is appropriate when "a party has been fully heard on an issue," and a court finds there is no "legally sufficient evidentiary basis to find for the party on that issue," and thus may "resolve the issue against the party" and "grant a motion for judgment as a matter of law against the party on . . . a defense that, under the controlling law, can be . . . defeated only with a favorable finding on that issue." Rule 50(a); <u>see</u> <u>also</u> <u>Nadel v. Isaksson</u>, 321 F.3d 266, 272 (2d Cir. 2003) (noting a district court on a Rule 50 motion must view evidence in favor of the non-moving party and may not weigh credibility of witnesses or consider weight of evidence).

Qualified immunity protects officers from civil liability where "their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). It is an "immunity from suit rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). "After trial, if defendants continue to urge qualified immunity, the decisive question, ordinarily, is whether the evidence favoring the party seeking relief is legally sufficient to overcome the defense." Ortiz. v. Jordan, __ S. Ct. __, 2011 WL 197801, at *3 (Jan. 24, 2011) (citing Fed. R. Civ. P. 50(a) and (b) for conditions on which judgment may be granted as a matter of law).

Until recently, courts resolved qualified immunity claims by making two inquiries in a mandated sequence. First, courts inquired whether the facts alleged, taken in the light most favorable to the party asserting the injury, showed an officer's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). Second, if a plaintiff had made out a violation, the court determined whether the right violated was "clearly established" at the time of a defendant's alleged misconduct, and qualified immunity applied unless the right was clearly established. Id.

In the Supreme Court's recent decision in Pearson v. Callahan, 129 S. Ct. 808 (2009), however, the Court held that

14

while the sequence of the <u>Saucier</u> inquiries was often appropriate and beneficial, the order in which the inquiries were made was no longer mandatory, and courts could in their discretion decide which prong should be addressed first in light of the circumstances in the case at hand. <u>Pearson</u>, 129 S. Ct. at 818. The Court observed adherence to the <u>Saucier</u> two-step protocol departed from the general rule of constitutional avoidance, and required adjudication of uncertain constitutional questions even when there was another ground upon which the case could be disposed. <u>Id.</u> at 821.

The second prong of the <u>Saucier</u> inquiry "turns on the 'objective reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" <u>Id.</u> at 822. Qualified immunity applies when "an officer reasonably believes that his or her conduct complies with the law." <u>Id.</u> at 823.

The second inquiry, the <u>Saucier</u> Court noted, "must be undertaken in light of the specific context of the case, not as a broad general proposition." <u>Saucier</u>, 533 U.S. at 201. The "dispositive inquiry" is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Id.</u> at 202. "If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." <u>Id.</u>

According to the Second Circuit, "[o]nly Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." Moore v. Vega, 371 F.3d 110, 114 (2d Cir. 2004); cf. Pearson, 129 S. Ct. at 823 (noting that in circumstances where the Tenth Circuit had not ruled on the legality of warrantless entries based on "consent-once-removed," officers in Pearson were entitled to rely on decisions issued by three other federal courts of appeal and state supreme courts). Cases in this Circuit suggest that, where aggressive or intrusive tactics are a reasonable response to concerns that the officer's or others' safety is in danger, the use of force is reasonable and will not necessarily convert an investigative stop into an arrest.

In United States v. Vargas, the Second Circuit held officers were justified in using a greater degree of force than was typical of a Terry stop, when, in response to a tip from a confidential informant that the suspect was an armed drug dealer, they attempted to speak with him, pursued him as he fled up an alleyway, and then had a brief struggle with him before he was placed on the ground, cuffed, and patted down. Vargas, 369 F.3d 98, 102 (2d Cir. 2004). The panel reasoned, "although under ordinary circumstances, drawing weapons and using handcuffs are not part of a Terry stop[,] intrusive and aggressive police

16

conduct is not an arrest 'when it is a reasonable response to legitimate safety concerns on the part of the investigating officers.'" Vargas, 369 F.3d 98, 102 (2d Cir. 2004).

In United States v. Alexander, the Second Circuit held DEA agents were justified in approaching a suspected narcotics purchaser, who was under surveillance in a high-crime neighborhood, with unholstered guns, ordering him out of his Jaguar and frisking him, and concluded this amounted to an investigative stop, not an arrest. Alexander, 907 F.2d 269, 272 (2d Cir. 1990). The panel reasoned that a:

> law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists . . . . "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."

Id. (quoting Terry v. Ohio, 392 U.S. 1, 27 (1968)). The Alexander panel also noted "[t]here are no hard and fast rules for evaluating the conduct of law enforcement agents conducting investigative stops." Id.

The Supreme Court has also noted the reasonableness of police action turns on the particular circumstances of the case, because the law enforcement officers "are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that

is necessary in a particular situation," and therefore "the
reasonableness of the officer's belief as to the appropriate
level of force should be judged from that on-scene perspective."
Saucier v. Katz, 544 U.S. at 205.

      ii.  <u>Qualified Immunity: Objective Reasonableness of
Troopers' Actions Under Second Prong of the
Saucier Inquiry</u>

Without deciding whether the Fortunatis have established a
constitutional violation on grounds their detention amounted to
an arrest without probable cause, rather than a stop placing them
in protective custody, this Court concludes that even if, on
Plaintiffs' version of the facts, a constitutional violation
could be shown, it would not be clear to a reasonable officer in
the Defendants' position that his conduct was unlawful in the
situation the Defendants confronted.  See Okin v. Village of
Cornwall-on-Hudson Police Dep't, 577 F.3d 415, 433 (2d Cir. 2009)
(objective reasonableness is met, and police officers entitled to
qualified immunity, if the question of whether the officers
violated rights "is one on which officers of reasonable
competence could disagree"); Walczyk v. Rio, 496 F.3d 139, 154
(2d Cir. 2007) ("Even if the right at issue was clearly
established in certain respects, . . . an officer is still
entitled to qualified immunity if 'officers of reasonable
competence could disagree' on the legality of the action at issue
in its particular factual context.")  In contrast, if "no officer

18

of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." Okin, 577 F.3d at 433. Qualified immunity operates to protect officers from the "sometimes 'hazy border between excessive and acceptable force.'" Saucier, 533 U.S. at 206.

Here, qualified immunity is warranted because there is no case in the Second Circuit clearly establishing that the Defendants' protective stop was not "within the bounds of appropriate police responses" given the circumstances of this case. Id. at 208.

The trial record reflects the state troopers had posted themselves a quarter-mile from the site of Joseph's shooting to secure the scene. Two of them were dressed in camouflage and carried semi-automatic weapons because of their role in the mission to apprehend Joseph. Three of them were dressed in trooper uniforms and carried service revolvers. Moments before the Fortunatis approached in their truck, the troopers had been warned the family learned of Joseph's death and would possibly arrive.

Earlier that day, they had been briefed regarding the dangers posed by Fortunati family members' potential reaction to the mission. They were aware Robert Fortunati possessed weapons and could reasonably have been concerned that weapons either were present in the approaching truck or were being carried by one or

19

more of its passengers.  They were aware Robert Fortunati had, in the past, expressed antipathy for state police.  Even accepting Plaintiffs' account that their truck did not speed or swerve as it approached the troopers, and their truck stopped and did not go beyond the parked cruisers, regardless of whether the cruisers were or were not intended to serve as a roadblock, a reasonable trooper could reasonably believe it was necessary to secure the troopers' safety and the safety of the scene by ordering all the truck's passengers out of the vehicle, frisking them and cuffing them, even though they were not belligerent or resisting, to ensure they carried no weapons and could not access any weapon potentially stored in the truck, keeping them in handcuffs while the truck was swept for weapons, and then releasing them twenty to thirty minutes later when Robert Fortunati was transported away.

While the show of force here was considerable, with at least two troopers ordering the Fortunatis out with drawn weapons, one of which was an assault weapon, the use of force in conducting stops has been upheld where officers reasonably believed their safety was in danger.  Even if using drawn weapons to order the family out of the truck exceeded what was necessary to effectuate the stop, it would not have been apparent this was unlawful in this particular context, in light of existing caselaw at the time of the incident.  See e.g., United States v. Alexander, 907 F.2d

269, 272 (2d Cir. 1990) ("The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.").

Here, the trial record indicates the troopers suspected the confrontation with the family could pose danger to their safety, for they had been briefed with facts suggesting the possibility – they knew beforehand that Robert Fortunati owned weapons, had voiced his antipathy for state troopers, had stated he would kill a trooper if given the opportunity, that he and family members had been informed of Joseph's death and were likely to be upset, and therefore the approaching truck, its contents, and any one of its passengers, posed a potential danger to the troopers.

In these very unique circumstances, the troopers are entitled to qualified immunity.  The Fortunatis have not presented evidence sufficient to overcome the defense.

IV.  Conclusion

Therefore, because Defendant Gardner was not personally involved in the detention, and all the Defendant troopers are entitled to qualified immunity, Defendants' renewed Rule 50(b) motion for judgment as a matter of law is GRANTED.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 15th day of February, 2011.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
Senior United States District Judge